**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**FELICIA ROBINSON**                                                           **PLAINTIFF**

**v.**                                                 **CIVIL ACTION NO: 1:19-CV-00121-SA-DAS**

**WEBSTER COUNTY, MISSISSIPPI;
WEBSTER COUNTY SHERIFF'S DEPARTMENT;
TIM MITCHELL; SANTANA TOWNSEND;
DAREN PATTERSON; and JOHN DOES 1-30**                      **DEFENDANTS**

---

**MEMORANDUM IN OPPOSITION TO WEBSTER COUNTY, MISSISSIPPI'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

---

COMES NOW, the Plaintiff, FELICIA ROBINSON, by and through counsel, who respectfully submits the following memorandum in opposition to WEBSTER COUNTY, MISSISSIPPI's Motion for Judgment on the Pleadings [Dkt. 22]:

## I. PREMISE STATEMENT

1.    DAREN PATTERSON was furloughed from the WEBSTER COUNTY, MISSISSIPPI jail and was allowed to do as he pleased in accordance with a policy, custom, usage, or practice established by the County's chief law enforcement policymaker, TIM MITCHELL.  Due to the pervasive entwinement between inmates such as Patterson and the County officials who supervised them, Patterson was a "state actor" for § 1983 purposes.  While on furlough, Patterson seized FELICIA ROBINSON in violation of the Fourth Amendment and deprived her of her due process rights in violation of the Fourteenth Amendment. Thus, the County is liable for Patterson's constitutional violations pursuant to Monell v. New York City Dept. of Social Servs., 436 U.S. 558 (1978).

2. WEBSTER COUNTY, MISSISSIPPI — by acting in deference to the interests of their inmate/trusty, DAREN PATTERSON — effectively took FELICIA ROBINSON's liberty under terms that provided no realistic means of escape while giving her no means of providing for her own care or safety. As such, the County had a special relationship with Mrs. Robinson, thereby obligating the County to protect her from abuse by the hand of their inmate, Patterson.

3. Presently, the State Created Danger Doctrine is not recognized by the Fifth Circuit. However, in disposing of previous cases that cite to this doctrine, the Fifth Circuit has articulated the elements that would rise to the level of state-created danger if the Fifth Circuit were to accept this doctrine. Here, WEBSTER COUNTY, MISSISSIPPI used its authority to create a dangerous environment for FELICIA ROBINSON by releasing her abusive husband on furlough, and then the County acted with deliberate indifference to her plight. The County recklessly created and then intentionally perpetrated the danger that caused Mrs. Robinson's constitutional violations even after they had learned that she was in immediate danger.

4. WEBSTER COUNTY, MISSISSIPPI failed to provide adequate and competent training or supervision to SANTANA TOWNSEND and/or to the JOHN DOE DEFENDANTS. Likewise, the County failed to provide adequate and competent supervision to DAREN PATERSON. The County's grossly inadequate training, hiring, or supervision policies directly caused the Plaintiff's injuries. This failure to train or supervise constituted deliberate indifference to Mrs. Robinson's constitutional rights.

5.      The question of whether DAREN PATERSON was an illegally released escapee who was not in custody is immaterial because WEBSTER COUNTY, MISSISSIPPI should be estopped from raising this defense pursuant to the doctrine of judicial estoppel, and barring that, because none of Mrs. Robinson's state-law claims bear directly upon the nature of Patterson's release.

6.      The Public Duty Doctrine does not immunize WEBSTER COUNTY, MISSISSIPPI from state law liability because FELICIA ROBINSON had such a direct and distinctive interest as to set her apart from all others in respect to the County's duty.

## II.      <u>STANDARD OF REVIEW</u>

In <u>Linicomn v. Hill</u>, 902 F.3d 529 (5th Cir., 2018), the Court of Appeals for the Fifth Circuit describes the standard of review for a Rule 12 (c) motion:

> We review a district court's grant of a Rule 12(c) motion for judgment on the pleadings *de novo*. A Rule 12(c) motion may dispose of a case when there are no disputed material facts and the court can render a judgment on the merits based on the substance of the pleadings and any judicially noticed facts. An adequate pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. A pleading offering only labels and conclusions, naked assertions, or a formulaic recitation of the elements of a cause of action will not do. To avoid dismissal, a plaintiff must plead sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. We must construe the complaint in the light most favorable to the plaintiff.

<u>Id</u>. at 533 (citations omitted).

"Federal Rule of Evidence ("FRE") 201(b) permits a court to take 'judicial notice' of a particular fact where that fact is 'not subject to reasonable dispute in that [the fact] is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable

of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" U.S. v. Boyd, 289 F.3d 1254 (10th Cir., 2002). Therefore, this Court may take judicial notice of the Exhibits attached to the Plaintiff's response, as well as the documents already present in this Court's file, since they are derived from official court filings, the accuracy of which are not in dispute. Cf. Linicomn, 902 F.3d at 533.

## III. RELEVANT FACTS

Daren Patterson was released from prison on probation in January 2018.[1] On May 29, 2018, while on probation, Patterson was arrested for assaulting a police officer and for possession of methamphetamine. He was placed in the Webster County Jail. Patterson never posted bond. [Complaint, ¶¶ 16-17, 19].

On September 1, 2018, Patterson was released from jail on a weekend furlough by Sheriff Tim Mitchell. That evening, Patterson tried to kill Mrs. Robinson, who is his wife, by pursuing her with a car as she ran. The Eupora Police Department prepared an incident report and informed Sheriff Mitchell accordingly. Nevertheless, Sheriff Mitchell released Patterson for another weekend furlough on November 2, 2018, knowing full well that Patterson would return to his wife and terrorize her. [Complaint, ¶2].

---

[1] Although Patterson was sentenced to eight years in prison, with four years to serve and four years on supervised release, the undersigned counsel has learned since filing the Complaint that Patterson was released from prison on probation/parole/early release on other occasions prior to January 2018. Each time he would be subsequently rearrested and sent back to MDOC lockup. While events prior to 2018 have little bearing on this matter, the undersigned counsel alerts this Court since this new information differs slightly from the facts stated in the Complaint.

On November 2, 2018, the furloughed Patterson punched a hole in the wall of Mrs. Robinson's house. In response, she called Santana Townsend—who was at work at the County Jail—for help. However, instead of dispatching a deputy to retrieve the belligerent Webster County inmate, Townsend gave the phone to another inmate to speak to Patterson. After talking with the other inmate, Patterson seethed with unbridled fury until he drenched Mrs. Robinson's nearly naked body with sulfuric acid, causing sixteen (16) second- and third-degree burns.  [Complaint, ¶¶ 3, 32].

On November 20, 2018, Patterson's probation was revoked by the Webster County Sheriff's Department.  On November 27, 2018, the Circuit Clerk prepared a Notice of Criminal Disposition, which states that Patterson was "confined" in the Webster County Jail from "5/30/2018 to 11/20/2018."  [Complaint, ¶¶ 19, 21; Exhibit D to Exhibit 1].

## IV.  ARGUMENT

### *Introduction.*

Pursuant to 42 U.S.C. § 1983, the County is responsible for any unconstitutional action that implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the County's officers. See Monell, 436 U.S. at 690. Likewise, the County is responsible for any unconstitutional action that implemented or executed a custom or usage of the County even though said custom or usage may not have received formal approval by the County's official decision-making channels. See id. at 691.

"Municipal liability under 42 U.S.C. § 1983 requires proof of 1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose moving force is the

policy or custom." <u>Rayborn v. Bossier Parish Sch. Bd.</u>, 881 F.3d 409, 416-17 (5th Cir., 2018) (internal citations and quotation marks omitted). "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." <u>Rivera v. Houston Indep. Sch. Dist.</u>, 349 F.3d 244, 247 (5th Cir., 2003) (internal citations and quotations omitted).

At all material times, Sheriff Mitchell acted under color of law as the "final policymaker[] with respect to all law enforcement decisions" within the County. <u>See Brooks v. George Cnty.</u>, 84 F.3d 157, 165 (5th Cir., 1996). Thus, Sheriff Mitchell had the authority to adopt, promulgate, and ratify policy statements, ordinances, regulations, decisions, customs, or usages for implementation by Sheriff's Department employees and inmates. Likewise, Townsend and Patterson acted under color of law whenever they followed the policy statements, ordinances, regulations, decisions, customs, or usages that were adopted, promulgated, or ratified by Sheriff Mitchell.

Sheriff Mitchell adopted, promulgated, or ratified one or more policy statements, ordinances, regulations, decisions, customs, or usages that gave Patterson multiple, unsupervised jail furloughs even though Sheriff Mitchell knew that Patterson was a threat to the public in general and, after September 1, 2018, to Mrs. Robinson in particular. These policy statements, ordinances, regulations, decisions, customs, or usages flowed from the lack of institutional control at the Sheriff's Department. Moreover, these policy statements, ordinances, regulations, decisions, customs, or usages were the moving forces behind the constitutional violations referenced herein.

As such, the unconstitutional conduct referenced herein bears the imprimatur of Sheriff Mitchell's official approval or acquiescence.[2] Therefore, such conduct is not "isolated" for the purposes of imputing municipal liability. Cf. Rivera, 349F.3d at 247. Accordingly, the County is liable to Mrs. Robinson for the following constitutional violations pursuant to Monell. Cf. id.

### Even Though He Was an Inmate, Daren Patterson Also Was a State Actor.

Pursuant to the aforesaid policy statements, ordinances, regulations, decisions, customs, or usages that gave Patterson multiple, unsupervised jail furloughs, the County provided "significant encouragement, either overt or covert" to Patterson by (1) releasing him from jail without bond on weekend passes and by (2) failing to retrieve him after Mrs. Robinson had called the County for help. Cf. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Assn., 531 U.S. 288, 296 (2001). Likewise, Patterson operated as a "willful participant in joint activity with the State or its agents" (1) when he left the Webster County Jail with the express permission of Sheriff Mitchell, who had actual knowledge of his penchant for harming Mrs. Robinson and (2) by virtue of him serving as a trusty, which made him a quasi-employee of the County. Cf. id. Moreover, as an inmate/trusty who was in the legal and physical custody of the County, Patterson was at all material times "controlled by an agency of the State." Cf. id. Furthermore, Townsend's decision to seek assistance from another trusty after Mrs. Robinson had called for help—instead of staying on the phone with Mrs. Robinson and dispatching a deputy to her house—

---

[2] In fact, as is set forth, infra, the County gave Daren Patterson jail credit for the nights he was out of jail abusing Mrs. Robinson, effectively ratifying his behavior.

further indicates how trusties such as Patterson were entwined with the execution of governmental policy. Cf. id.

As the result of this pervasive entwinement between trusties such as Patterson and the County employees who supervised them, Patterson was a "state actor" for § 1983 purposes. Cf. id. Therefore, as a state actor, Patterson operated under color of law when he abused, terrorized, attempted to kill, and permanently disfigured Mrs. Robinson on September 1, 2018, and November 2-3, 2018. Cf. id. at 295 at n.2. ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes.")

State-actor Patterson violated the following constitutional rights of Mrs. Robinson:

1. Fourth Amendment. Pursuant to the Fourth Amendment, which is incorporated to the States via the Fourteenth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Therefore, as a state actor, Patterson had the duty to refrain from (1) seizing (or attempting to seize) Mrs. Robinson's person, (2) prohibiting her from leaving her own home, and (3) abusing her.

2. Fourteenth Amendment. The Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." As such, Mrs. Robinson had a substantive due process right to be free from state-occasioned bodily harm. Therefore, as a state actor, Patterson had the duty to refrain from causing (or attempting to cause) bodily harm to Mrs. Robinson or restraining (or attempting to restrain) her liberty without due process of law.

### *Because Daren Patterson Acted Pursuant to an Official Policy, Custom, Usage, or Practice, the County is Liable for His Actions.*

When Sheriff Mitchell released Patterson on September 1, 2018, for a weekend furlough, even though Patterson had assaulted Officer Henderson only a few months earlier, Sheriff Mitchell adopted, promulgated, or ratified one or more policy statements, ordinances, regulations, decisions, customs, or usages (a) giving inmates or trusties exceptionally broad latitude to do almost as they pleased and/or (b) giving Patterson multiple jail furloughs. Likewise, by releasing Patterson from jail on November 2, 2018, for another weekend pass, even though Patterson had tried to kill Mrs. Robinson during the previous weekend furlough in September 2018, Sheriff Mitchell advanced these policy statements, ordinances, regulations, decisions, customs, or usages even further.

As such, Sheriff Mitchell – *i.e.*, the chief policymaker for the County, see Brooks, 84 F.3d at 165 – adopted, promulgated, or ratified one or more policy statements, ordinances, regulations, decisions, customs, or usages that effectively gave Patterson *carte blanche* to do as he pleased during his weekend furloughs from jail.  Pursuant to these policy statements, ordinances, regulations, decisions, customs, or usages, Santana Townsend declined to send a deputy to halt Patterson's furlough on November 2, 2018, even though she knew that Patterson was acting violently toward Mrs. Robinson. Instead, while acting pursuant to these policy statements, ordinances, regulations, decisions, customs, or usages, which were the moving forces for her decision, Townsend merely directed another inmate to talk to Patterson. In turn, she ratified Patterson's violent behavior, giving him the tacit go-ahead to continue abusing Mrs. Robinson.

Therefore, the County is liable for Patterson's acts pursuant to <u>Monell</u> because the aforesaid policy statements, ordinances, regulations, decisions, customs, or usages of allowing Patterson to have multiple weekend furloughs – and to do as pleased while he was on these weekend furloughs – were the moving forces behind Patterson's sadistic abuse of Mrs. Robinson.

### *The County Had a Special Relationship with Mrs. Robinson Under Federal Law*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

While individuals have a substantive due process right to be free from state-occasioned bodily harm, state officials do not, as a general matter, have a constitutional duty of care to protect individuals from injuries caused by themselves or others. <u>See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 196-97 (1989) ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.").

However, the Supreme Court has noted that this categorical rule is subject to at least one limited exception: A state may create a "special relationship" with a particular citizen, requiring the state to protect him from harm, "when the State takes a person into its custody and holds him there against his will." <u>Id.</u> at 199-200. This "special relationship" arises when a person is involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power. <u>Walton v. Alexander</u>, 44 F.3d 1297, 1299 (5th Cir., 1995).

The Supreme Court recognized that this special relationship exists when the state takes custody of a prisoner, <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-04 (1976), or involuntarily commits someone to an institution. <u>Youngberg v. Romeo</u>, 457 U.S. 307, 315-16 (1982). The Fifth Circuit has extended the exception to children in foster care, as well. <u>Griffith v. Johnston</u>, 899 F.2d 1427, 1439 (5th Cir., 1990).

By releasing Patterson from jail for a weekend furlough, even though he knew that Patterson had been violent toward Mrs. Robinson during the previous weekend furlough, Sheriff Mitchell – via a governmental order or the affirmative exercise of state power – adopted, promulgated, or ratified one or more policy statements, ordinances, regulations, decisions, customs, or usages that gave Patterson free reign while on his weekend jail furloughs. Acting pursuant to these policy statements, ordinances, regulations, decisions, customs, or usages, Santana Townsend declined to send a deputy to interrupt Patterson's weekend furlough even though Mrs. Robinson was in grave peril. Instead, by way of an affirmative exercise of state power, Townsend directed another inmate or trusty to speak to Patterson. Thus, Townsend doomed Mrs. Robinson to further confinement by Patterson and to the life-altering abuse that would continue to befall her.

Restated, the County, acting in deference to the interests of their inmate/trusty (*i.e.*, Patterson), effectively took Mrs. Robinson's liberty under terms that provided no realistic means of escape while giving her no means of providing for her own care or safety. Even when she got in the car to race to the hospital after being burned, Mrs. Robinson was involuntarily escorted by Patterson who spied on her in the hospital. This occurred due to the County's deliberate indifference and/or outrageous conduct.

Therefore, Mrs. Robinson was, at all material times, in a special relationship with the County, obligating the County to protect her. Despite this, the County failed to protect Mrs. Robinson—even when it was put on direct notice of Patterson's violent behavior while the same was being directed to her specifically.

Therefore, the County is liable for Patterson's violations of Mrs. Robinson's civil rights since the County had a special relationship with her.

### *The County Should Be Held Liable for Creating the Danger Mrs. Robinson Faced.*

Plaintiff acknowledges that the State-Created Danger doctrine is not currently recognized by the Court of Appeals for the Fifth Circuit. However, Plaintiff believes this fact pattern should be persuasive enough for the Court of Appeals to adopt this cause of action. Therefore, pursuant to Rule 11 of the Federal Rules of Civil Procedure, the undersigned counsel is presenting this legal theory in good faith, believing that this is a nonfrivolous argument for creating new law.

Courts of Appeals from various circuits have extended the special relationship exception to situations where the state created the danger. Although the Fifth Circuit has not adopted this theory, it has stated on numerous occasions the elements that such a cause of action would require if it were to recognize such a theory, *to-wit*: A plaintiff must show [1] the defendants used their authority to create a dangerous environment for the plaintiff and [2] that the defendants acted with deliberate indifference to the plight of the plaintiff." See Doe v. Covington Cnty. Sch. Dist., 675 F.3d 849, 865 (5th Cir., 2012) (en banc). The Covington Court further states:

> To establish deliberate indifference for purposes of state-created danger, the plaintiff must show that "[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and ... they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 585 (5th Cir., 2001) (citation and internal quotation marks omitted); <u>see</u> <u>also</u> [<u>McClendon v. City of Columbia</u>, 305 F.3d 314, 326 n. 8 (5th Cir., 2002)] ("To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim's health or safety.") (internal quotation marks and alterations omitted). Critically, this court has explained that the "state-created danger theory is inapposite without a known victim." [<u>Rios v. City of Del Rio</u>, 444 F.3d 417, 424 (5th Cir., 2006)] (citation and internal quotation marks omitted); <u>see</u> <u>also</u> <u>Lester v. City of Coll. Station</u>, 103 Fed.Appx. 814, 815–16 (5th Cir., 2004) ("[E]ven if it is assumed that the state-created-danger theory applies, liability exists only if the state actor is aware of *an immediate danger facing a known victim*.") (<u>citing</u> <u>Saenz v. Heldenfels Bros., Inc.</u>, 183 F.3d 389, 392 (5th Cir., 1999)) (emphasis added).

<u>Id.</u>

Sheriff Mitchell had possessed actual knowledge that Patterson was a specific and credible threat to Mrs. Robinson's health and safety even before he authorized Patterson's release on or about November 2, 2018. In addition, Townsend had been telephoned about Patterson's violent behavior toward Mrs. Robinson less than three hours before he poured sulfuric acid over Mrs. Robinson's nearly naked body. Thus, Sheriff Mitchell and/or Townsend were aware of an immediate danger facing a known victim, *i.e.,* Mrs. Robinson.

Both Sheriff Mitchell and Townsend – and by extension, the County – had actual knowledge of the excessive risk to Mrs. Robinson's health or safety. Nevertheless, they disregarded this risk to further one or more policy statements, ordinances, regulations,

decisions, customs, or usages that allowed Patterson to have prodigious latitude while on weekend furloughs from jail.   As such, the County used its authority to create a dangerous environment for the Plaintiff, and the County acted with deliberate indifference to her plight by turning a deaf ear to her cries for help. See id.

Restated, the County recklessly created and then intentionally perpetuated the danger that caused Mrs. Robinson's constitutional violations even after learning that she was in immediate danger. This shocks the conscience.

Therefore, the County is liable for Patterson's violations of Mrs. Robinson's civil rights since the County created the very danger she faced.

### The County Should Be Held Liable for Its Failure to Train and Supervise Employees and Inmates.

The County failed to provide adequate and competent training or supervision to Townsend and/or to the John Doe Defendants referenced herein. Likewise, the County failed to provide adequate and competent supervision to Patterson.

The County was tasked with the non-delegable duty to formulate, oversee, and implement official policies, procedures, practices, and customs that were to be carried out by County employees and inmates pursuant to state and federal law. As such, the County needed to hire competent employees, train them to follow these policies, and supervise them accordingly. Likewise, the County needed to supervise inmates like Patterson.

The training, hiring, or supervision procedures of the County were grossly inadequate. The County and Sheriff Mitchell were deliberately indifferent in adopting a training, hiring, or supervision policy.  Moreover, the inadequate training, hiring, or

supervision policy directly caused the Plaintiff's injuries, as described herein. Cf. Benavides v. Cnty. of Wilson, 955 F.2d 968, 972 (5th Cir., 1992).

Restated, Sheriff Mitchell failed to train Townsend as to the proper procedures for assisting victims seeking help with belligerent inmates who are out on furlough. Upon information and belief, Sheriff Mitchell provided no training whatsoever to Townsend in this regard. Likewise, Sheriff Mitchell failed to supervise Townsend in the proper handling of calls from victims who were being terrorized by inmates on furlough. Moreover, he also failed to supervise Patterson. A causal connection exists between this lack of training or supervision and the violation of Mrs. Robinson's rights. In fact, because the need for more or different training or supervision was so obvious, and the inadequacy so likely to result in violations of constitutional rights, this failure to train or supervise constituted deliberate indifference to Mrs. Robinson's constitutional rights. Cf. Peña v. City of Rio Grande City, 879 F.3d 613, 623 (5th Cir., 2018) (citing City of Canton v. Harris, 489 U.S. 378, 390 at n.10 (1989)); Benavides, 955 F.2d at 972.

As a direct and proximate result of the failure of the County and Sheriff Mitchell to develop, implement, and otherwise devise a proper policy of adequate employee training and supervision, the Plaintiff was deprived of certain constitutional rights, privileges, and immunities guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Accordingly, the County should be held liable to Mrs. Robinson for the damages that were occasioned thereby.

## The County Should Be Judicially Estopped from Asserting That Daren Patterson Was an Illegally Released Escapee Who Was Not in the County's Custody

"The doctrine of judicial estoppel is equitable in nature and can be invoked by a court to prevent a party from asserting a position in a legal proceeding that is inconsistent with a position taken in a previous proceeding." Love v. Tyson Foods, Inc., 677 F.3d 258, 261 (5th Cir., 2012) (citing Reed v. City of Arlington, 650 F.3d 571, 573–74 (5th Cir.2011) (en banc). "The aim of the doctrine is to 'protect the integrity of the judicial process.'" Id. (quoting New Hampshire v. Maine, 532 U.S. 742, 749–50 (2001)). "Because the doctrine [of judicial estoppel] is intended to protect the judicial system, rather than the litigants, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary." In re Coastal Plains, Inc., 179 F.3d 197, 205 (5th Cir., 1999) (internal citation omitted). Moreover, "[b]ecause judicial estoppel is an equitable doctrine, courts may apply it flexibly to achieve substantial justice." Reed v. City of Arlington, 650 F.3d 571, 574 (5th Cir., 2011) (citing New Hampshire, 532 U.S. at 750.)

In determining whether to apply judicial estoppel, the Fifth Circuit looks to the following criteria: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." Love, 677 F.3d at 261. "However, judicial estoppel is not governed by 'inflexible prerequisites or an exhaustive formula for determining [its] applicability,' and numerous considerations 'may inform the doctrine's application in specific factual contexts.'" Id. (quoting New Hampshire, 532 U.S. at 751). In fact, the Supreme Court has adopted the position of other courts that "the

circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." New Hampshire, 532 U.S. at 750. However, the Supreme Court does list three factors that "typically inform" the decision whether to apply the doctrine in a particular case:

> First, a party's later position must be "clearly inconsistent" with its earlier position. United States v. Hook, 195 F.3d 299, 306 (CA7 1999); In re Coastal Plains, Inc., 179 F.3d 197, 206 (CA5 1999); Hossaini v. Western Mo. Medical Center, 140 F.3d 1140, 1143 (CA8 1998); Maharaj v. Bankamerica Corp., 128 F. 3d 94, 98 (CA2 1997). Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," [Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (CA6 1982)]. Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," United States v. C. 1. T. Constr. Inc., 944 F.2d 253, 259 (CA5 1991), and thus poses little threat to judicial integrity. See Hook, 195 F. 3d, at 306; Maharaj, 128 F. 3d, at 98; [Konstantinidis v. Chen, 626 F.2d 933, 939 (CADC 1980)]. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. See [Davis v. Wakelee, 156 U.S. 680, 689 (1895)]; Philadelphia, W., & B. R. Co. v. Howard, 13 How. 335-337 (1852); [Scarano v. Central R. Co., 203 F.2d 510, 513 (CA3 1953)] (judicial estoppel forbids use of "intentional self-contradiction ... as a means of obtaining unfair advantage"); see also 18 Wright § 4477, p. 782.

Id. at 750-51.

The County takes the position that Daren Patterson was released illegally from the Webster County Jail, that he was an escapee who was not in the County's custody when he abused the Plaintiff, and that his releases were unlawful. As such, the County

contends that it is not liable to the Plaintiff for the actions of their inmate, Daren Patterson, even though Patterson had been released by the chief law enforcement policymaker of the County on September 1, 2018, and November 2-3, 2018. See Brooks, 84 F.3d at 165 ("Sheriffs in Mississippi are final policymakers with respect to all law enforcement decisions made within their counties.").

The County's current position, however, is diametrically opposite to the position it took less than one year ago in the matter of *State of Mississippi v. Daren Patterson*, Webster County Circuit Court Cause No. CR2013-041. On November 27, 2018, the Circuit Clerk filed a Notice of Criminal Disposition in the aforesaid matter. Therein, the Circuit Clerk plainly states that Patterson was "confined" in the Webster County Jail from May 30, 2018, to November 20, 2018. See Exhibit A to the Response; see also Exhibit 1-D of the Complaint. [Dkt. 1-1].

Obviously, September 1, 2018, and November 2-3, 2018 (*i.e.*, the dates Patterson abused the Plaintiff) fall within the dates of confinement referenced in the Notice of Criminal Disposition. Therefore, this Notice of Criminal Disposition clearly states that Patterson was "confined" on September 1, 2018, and November 2-3, 2018.

The Sheriff is charged with the statutory duty to maintain a complete jail docket that records, *inter alia*, "the name of the prisoner … how long the prisoner was so imprisoned, [and] how released or discharged." See Miss. Code Ann. § 19-25-63. Therefore, we may reasonably infer that the Sheriff's Department was the exclusive repository for the Circuit Clerk's information regarding Patterson's jail credits since only the Sheriff had the statutory duty to log this information. Thus, we may reasonably infer

that the County – acting by and through the Sheriff's Department – represented to the Circuit Clerk that Daren Patterson was in jail on September 1, 2018, and November 2-3, 2018 and not out of custody as an illegally-released escapee.[3]

The Circuit Clerk's office is under the control of the Circuit Court pursuant to Miss. Code Ann. § 9-1-29 ("Each court shall have control over all proceedings in the clerk's office … "). Therefore, the County's representations to the Circuit Clerk about Patterson's jail credits were representations to the Circuit Court, itself. As such, the County's prior position before the Circuit Court (*i.e.*, that Patterson was in official custody on September 1, 2018, and November 2-3, 2018) differs entirely from its current position before this Honorable Court (*i.e.*, that Patterson was an illegally released escapee who was not in the County's custody on September 1, 2018, and November 2-3, 2018). Thus, the first element of judicial estoppel - *i.e.*, an inconsistent legal position - is met. See <u>Love</u>, 677 F.3d at 261.

When the Circuit Clerk noted the County's representations about Patterson's jail credits on the Notice of Criminal Disposition, the Circuit Clerk – and by extension, the Circuit Court – accepted the County's representations about Patterson's jail credits as true. In fact, the Circuit Clerk signed her name and affixed the official seal of the Court on the document, thereby making the same an official court record. As further evidence of the

---

[3] The Plaintiff invites the Court to take judicial notice of Exhibit "A," which contains a certified copy of a document that was faxed from the Webster County Jail to the Circuit Clerk. Said facsimile, which has been filed with the matter of *State v. Patterson*, Webster County Circuit Court Cause No. CR2013-041, informs the Circuit Clerk that Patterson was confined between May 30, 2018, and November 20, 2018, while mentioning no intervening furloughs. Thus, this facsimile corroborates Mrs. Robinson's inferences herein about the Sheriff's Department's representations about Patterson's jail time.

Court's acceptance, we may surmise from the face of the Notice of Criminal Disposition that the Circuit Clerk delivered a copy of the same to the Mississippi Department of Corrections ("MDOC") and to the Administrative Office of the Courts ("AOC") since the form directs the Circuit Clerk to do so. So not only was this representation accepted by the Circuit Court, it was accepted by the MDOC and the AOC, which is the administrative arm for all state courts in Mississippi. Accordingly, the second element of judicial estoppel - *i.e.*, acceptance by a court - is met. See Love, 677 F.3d at 261.

Finally, this inconsistent position should not be chalked up to mere inadvertence or mistake. Cf. New Hampshire, 532 U.S. 742 at 753 ("We do not question that it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake.") (citations omitted). The entries on the jail docket are to "… be full and complete, so as to give a perfect history of each case." § 19-25-63. Therefore, we may presume that Patterson furloughs were duly noted on the jail docket, which would have been readily accessible to Sheriff's Department staff. Conversely, even if the jail docket did not accurately reflect Patterson's releases, the Notice of Criminal Disposition was prepared barely three weeks after he had been out on his last furlough. As such, the November 2-3, 2018, release of Patterson – if nothing else – would have been fresh on the minds of Sheriff's Department personnel. Either way, the County's failure to provide the Circuit Clerk with the actual number of days that Patterson was in jail could hardly be attributed to mere inadvertence or mistake—especially since this failure concealed Patterson's furloughs from public scrutiny while giving him full jail credit for the time he was out, about, and abusing the Plaintiff.

As the Notice of Criminal Disposition states, it must be delivered to the MDOC and the AOC.  Therefore, people outside Webster County necessarily would have seen this Notice.  The County had a clear motive to conceal this information from not only the Circuit Court, but also from higher authorities in state government.  No one looking at the Notice of Criminal Disposition would have suspected that Patterson had been released from the Webster County Jail on multiple passes, let alone that he had tortured the Plaintiff in the process.  Therefore, giving Patterson full jail credit for the time on furlough was a small price to pay for the benefit of hiding Plaintiff's abuse under the proverbial rug.  So, any attempt by the County to attribute this to mere inadvertence would be improper.  Thus, the third element of judicial estoppel - the party did not act inadvertently - is met.  See Love, 677 F.3d at 261.

Along these lines, the County seeks an unfair advantage by raising these defenses in the first place.  Cf. New Hampshire, 532 U.S. at 750 ("A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.").  By representing to the Circuit Court, the MDOC, and the AOC that Daren Patterson had been in the County's continuous custody from May 30, 2018, to November 20, 2018, the County avoided the detriment of outside scrutiny, which in and of itself is a benefit.  Now, the County seeks immunity from the consequences of Patterson's egregious behavior by claiming that he was an illegally released escapee – even though the County had voluntarily given Patterson full jail credit for when he was out abusing his wife.

This fact cannot be overstated:  **<u>The County rewarded Daren Patterson by giving him full jail credit for the night he poured sulfuric acid over his wife's naked body causing her to suffer third-degree burns from head to toe</u>**.

Plaintiff respectfully submits that no body politic should be rewarded for giving jail credit to an inmate for the time he was outside the jail committing the most heinous expression of domestic violence short of murder when he should have been inside the jail instead.  This evinces unclean hands at its worst.  Therefore, even if the elements of judicial estoppel have not been met precisely, a burden the Plaintiff respectfully submits that she has met, the County's ratification of Patterson's behavior by and through the reward of full jail credit should inform the doctrine of judicial estoppel's application to this specific factual context.  <u>See</u> <u>Love</u>, 677 F.3d at 261 (<u>quoting</u> <u>New Hampshire</u>, 532 U.S. at 751).   As such, Plaintiff respectfully submits that the County's unclean hands in this regard should not be countenanced by this Honorable Court.

Given that the elements of judicial estoppel have been met, and in view of the County's unclean hands, the County should be barred from changing its position regardless of whether the current position may be correct in the abstract.  It would be inequitable for the County to disavow responsibility for the actions of Patterson when the County has declared in a previous court proceeding that Patterson was in the Webster County Jail – and therefore in the County's custody – when he abused the Plaintiff.

Therefore, since the County has represented to the Circuit Court of Webster County, Mississippi, that Patterson was in the County's custody on September 1, 2018,

and November 2-3, 2018, the County should forever be bound by that representation. The County should be estopped from raising any defense to the contrary.[4]

### *Alternatively, Even if the County is Not Estopped from Raising the Purported Illegality of Patterson's Release, the Release, Itself, Has No Bearing on the State Law Claims*

Without waiving the preceding argument that the County is estopped from alleging that Daren Patterson was in illegally released escapee who was not in the County's custody, Mrs. Robinson asserts the following in the alternative.

Mrs. Robinson's state-law claims against the County are for failure to supervise an inmate (Counts VI and VII), gross negligence (Count VIII), and negligent infliction of emotional distress (Counts IX and X).

None of these claims, as stated, bear directly upon the precise question of whether the County should have released Patterson from jail at all. Instead, Counts VI and VII deal with the County's failure to supervise Patterson; Count VIII deals with the County's failure to respond to Mrs. Robinson's call for help when she was being abused by the County's inmate; and Counts IX and X deal with the County's negligent infliction of emotional distress in these regards. Therefore, Plaintiff's state law claims bear upon the County's continuing duty to supervise Patterson even after he was released, thus making the relative legality of Patterson's release a moot question.

---

[4] Incidentally, the Court should take judicial notice that Sheriff Mitchell, himself, has admitted in his Answer that "Patterson was custody of the County from May 30, 2018, to November 20, 2018." [Mitchell Answer, p. 5, ¶19, DKT 24]

Assuming, *arguendo*, that the Sheriff did commit an illegal act by releasing Patterson, said release is not a specific factor in any of the state-law claims that Mrs. Robinson alleges. Regardless of whether Patterson had been released illegally or whether he had escaped by force, the County had a continuing duty to secure him either way. See Miss. Code Ann. § 19-25-75 ("If there be danger of escape ... of any prisoner therein ... it is the duty of the sheriff or jailer to summon a sufficient guard to protect and secure such prisoner ... so long as the same may be necessary and no longer."). So even if the Sheriff did commit a criminal act by releasing Patterson, the County still had a duty to supervise Patterson while he was out. If anything, this duty would be heightened by the urgency of recapturing an inmate.

Naturally, the County will argue the Public Duty Doctrine as a defense. However, as the next section demonstrates, the Public Duty Doctrine provides no respite for the County.

### The Public Duty Doctrine Does Not Immunize the County

Since the County has represented to the Circuit Court of Webster County, Mississippi, that Patterson was in their custody from May 30, 2018, through November 20, 2018, the County had a duty to supervise him at all material times. The question of state-law liability now turns on whether the County's duty to supervise Patterson was owed to the public-at-large or if Mrs. Robinson can assert a private right in that regard.

In Robinson v. Estate of Williams, 721 F. Supp. 806 (S.D. Miss., 1989), the U. S. District Court for the Southern District of Mississippi sketches the framework for this issue. The Court opines:

Defendant bases the present motion upon, *inter alia*, the absence of any duty on the part of a sheriff to individual members of the public under the circumstances of this case. Under Mississippi law, for actionable negligence to exist, the defendant must owe a legal duty to the plaintiff — or, as here, to the plaintiff's decedent. <u>Karpovs v. State of Mississippi</u>, 663 F.2d 640, 649 (5th Cir.1981) (<u>citing</u> J.C. Penney Co. v. Sumrall, 318 So.2d 829 (Miss.1975); Stanley v. Morgan & Lindsey, Inc., 203 So.2d 473 (Miss.1967)). A sheriff in this state is charged with the duty to "take into his custody, and safely keep, in the jail of his county" all persons committed thereto. Miss. Code Ann. § 19-25-35 (1972). He has "charge of the ... jail of his county, of the premises belonging thereto, and of the prisoners in said jail." Miss. Code Ann. § 19-25-69. Also, "if there be danger of escape ... of any prisoner therein ... it is the duty of the sheriff or jailer to summon a sufficient guard to protect and secure such prisoner ... so long as the same may be necessary and no longer." Miss. Code Ann. § 19-25-75. These duties imposed upon the sheriff are duties owed to the public as a whole. As far as the court can determine, no Mississippi court has squarely addressed the duty issue presented herein. However, from the Mississippi authorities discussed, the court finds it highly unlikely that the Mississippi courts would consider the sheriff to have owed a duty of care to plaintiff's decedent. **The sole factor which distinguishes plaintiff's decedent from the populace of Clarke County is the harm he suffered allegedly as a result of the sheriff's negligence.** This, according to longstanding Mississippi law, is clearly insufficient to establish a duty of care owing to him in particular:

> When the duty imposed upon an officer is one solely to the public, the failure to perform it, or an erroneous or negligent performance, is regarded as an injury to the public and not to an individual member of the public; and an individual harmed thereby may not have redress against the officer unless the individual had in it such a direct and distinctive interest as to set him apart from all others of the public in respect to it, and the fact of the injury does not in itself serve to make out the direct and distinctive interest which is essential.

State v. Matthews, 18 So.2d 156 (Miss.1944) (emphasis added).

Other courts which follow the rule as it stands in Mississippi hold that without a "special relationship between the sheriff and an individual, the sheriff's duty is `a public duty, for neglect of which the officer is answerable to the public and punishable by indictment.'" See, e.g., Martin v. Malhoyt, 830 F.2d 237, 259 (D.C.Cir.1987) (quoting South v. Maryland, 59 U.S. 396, 403, 15 L.Ed. 433 (1856)). **Plaintiff has produced no evidence which would establish a special relationship between herself and/or her decedent and the sheriff. Thus, she has failed to demonstrate the existence of an essential element of her case: that the sheriff owed a duty of care to plaintiff or her decedent.**

Robinson, 721 F. Supp., at 807-08 (emphasis added in bold).  Thus, pursuant to this framework, the Sheriff has a public duty to "take into his custody, and safely keep, in the jail of his county" all persons committed thereto.  Id. (citing Miss. Code Ann. § 19-25-35). He also has "charge of the ... jail of his county, of the premises belonging thereto, and of the prisoners in said jail." Id. (citing Miss. Code Ann. § 19-25-69).   However, when the County has a "special relationship" with a citizen, such as it did with Mrs. Robinson, the County's duty to protect the public from inmates is transformed into a private duty to protect that particular citizen from inmates. Cf. id.

In Gant v. Maness, 786 So.2d 402 (Miss. 1999), the Mississippi Supreme Court describes various factors that could be used to determine whether a person has a special relationship with the County whenever an innocent bystander is harmed by an inmate.

In Gant, one Mr. Thompson pled guilty to second-offense DUI on April 4, 1991.  Id. at 403.  He was sentenced to serve six months in the Alcorn County jail beginning on April 5, 1991.  Id. The justice court judge modified the sentence to allow Thompson to

leave the jail for work every day and to return in the evening.  Id.  Lila Maness alleged that on Sunday, April 7, 1991, at 6:10 p.m., she was involved in an automobile accident with Thompson.  Id.  According to Maness, Thompson was cited for DUI.  Id.

Justice Mills, speaking for the majority, writes:

> The facts of the case *sub judice* reveal that Maness is not within a category of persons setting her apart from members of the public as a whole with respect to Gant's duty as sheriff. Excerpts from her deposition (which, unlike Gant's, are found in the record) include her admissions that **she did not know Thompson, had never met him before the accident, had never spoken with him in person or by telephone, had no knowledge of his criminal or court record, had never been in a court proceeding involving Thompson, and had never testified against him**. Thus, Maness cannot establish such a direct and distinctive interest as to set [her] apart from all others of the public in respect to the sheriff's duty owed to the public as a whole.  Because Gant owed no duty to Maness as an individual, we find that he cannot be liable to her under the facts of this case.

Id. at 405-06 (citations omitted, emphasis added in bold).   Therefore, by reverse implication, (1) if Maness had known Thompson, (2) if she had spoken with him, (3) if she had knowledge of his criminal or court record, (4) if she had been in a court proceeding with Thompson, and/or (5) if she had testified against him, then Maness would have been able to establish "a direct and distinctive interest as to set her apart from all others of the public with respect the Sheriff's duty owed to the public as a whole." Cf. id. at 406 (quoting State ex rel. Boyle v. Matthews, 18 So.2d 156, 158 (1944)).

In the case at bar, Patterson and Mrs. Robinson were married [Complaint, ¶¶ 2, 15]. Obviously, Mrs. Robinson knew Patterson and had spoken with him. See id. at 405. Furthermore, she clearly knew about Patterson's criminal or court record since he was in jail during their marriage [Complaint, ¶¶ 16-19]. See id. Moreover, the Court should take judicial notice of the pleadings in the Patterson/Robinson divorce case that was opened in the Chancery Court of Webster County, Mississippi on July 19, 2017 in Cause No. 2017-105. (See Exhibit "B" to the Response.) Although this case may have been abandoned, the pleadings nevertheless show that the parties were involved in a court proceeding prior to the events in question. See id. Furthermore, while the Complaint makes no mention of Mrs. Robinson testifying in court against Patterson, it does states that Mrs. Robinson made a statement to the Eupora Police Department on September 1, 2018, describing how Patterson had just tried to run her over with a car. [Complaint, ¶¶ 24-25, Exhibit H to Exhibit 1]. Naturally, such a statement would form the foundation of her testimony in any related criminal case. Cf. id.

Therefore, on balance, the factors referenced by Justice Mills in Gant, supra, are tracked almost perfectly, clearly establishing that Mrs. Robinson had "a direct and distinctive interest as to set her apart from all others of the public with respect the Sheriff's duty owed to the public as a whole" vis-à-vis the supervision of Patterson – whether inside or outside the Webster County Jail. Cf. id. at 406 (quoting Matthews, 18 So.2d 156, 158 (1944)). However, even if the Gant factors are not enough to show that the County had a "special relationship" with Mrs. Robinson, her conversation with Townsend as referenced in the Complaint should suffice. [Complaint, ¶¶ 32-33].

On November 2, 2018, Ms. Robinson called Townsend at work about Patterson's violent behavior while he was inside her residence. At that precise moment, if at no time earlier, Ms. Robinson's "direct and distinctive interest as to set her apart from all others of the public" became vested since Mrs. Robinson was asking Townsend for help in maintaining Patterson, the County's furloughed inmate. See id. If nothing else, Townsend's failure to alert her superiors of Mrs. Robinson's call triggered the County's "special relationship" with Mrs. Robinson since the County was, in effect, delegating the responsibility of Patterson's supervision and control to Mrs. Robinson, herself, even though Townsend admits that she knew Patterson was abusive to Mrs. Robinson.[5]

Not only did Mrs. Robinson have a previous relationship with Patterson, unlike Manus's lack of relationship with Thompson in Gant, cf. id. at 405, Mrs. Robinson was the only member of the general public who had a violent inmate in her home that the County, acting by and through Townsend, deliberately refused to retrieve. Moreover, Sheriff Mitchell and Santana Townsend both knew of his propensity to abuse Mrs. Robinson, in particular. Therefore, the harm that Mrs. Robinson suffered is not the sole factor that separates her from the public. Cf. Robinson, 721 F. Supp., at 807.

---

[5] As she reveals in her *pro-se* Answer, Townsend told Robinson on the night of November 2, 2018, "[Patterson] don't want me to talk and you have to do what you have to do." [*Exhibits to Townsend Answer*, p. 10, Dkt. 13-1]. Thus, following the example set by Pontius Pilate centuries earlier, Townsend washed her hands of Patterson's belligerence, leaving Mrs. Robinson to fend for herself -- even though Townsend believed that the "… **abuse** plaintiff endured at the hands of her husband **was normal**…." [*Townsend Answer*, p. 5, Dkt. 13, with emphasis added]. Nevertheless, despite her personal knowledge, she still did not call a deputy to retrieve Patterson.

In view of the foregoing, the County had a special relationship with Mrs. Robinson since the County was, in effect, leaving their unsupervised inmate in her house despite knowing of Patterson's violent disposition to her and despite knowing that she was facing an immediate threat from him. This special relationship nullifies any immunity derived from the public duty doctrine.

### _This Court Should Assume Supplemental Jurisdiction_

Finally, Mrs. Robinson asserts that this Court should assume supplemental jurisdiction over the state law claims raised herein.

First, no state law claim poses "a novel or complex issue of state law." <u>Cf.</u> 28 U.S.C. § 1367 (c)(1). As the Court can readily surmise from the text of the state law claims, the case law forming the basis for each claim is cited and the elements thereof are tracked precisely. The County's defense that Patterson was illegally released, as mentioned, should be disregarded pursuant to federal case law related to judicial estoppel. As for the County's defense of public duty, the County has cited federal cases from the Southern District of Mississippi that touch upon this topic, indicating that the subject matter is not too complex for a federal court such as this one to handle.

Second, no state law claim "substantially predominates over the claim or claims over which the district court has original jurisdiction." <u>Cf.</u> 28 U.S.C. § 1367 (c)(2). The primary focus of the Complaint is the violation of Mrs. Robinson's civil rights by way of the actions of state actors in pursuit of official policies, customs, usages, and practices as established or ratified by Sheriff Tim Mitchell.

Third, Mrs. Robinson respectfully submits that, based upon the twenty (20) reported federal cases that she lists in the table of contents to her Complaint and the cited authority contained therein, she has a valid federal claim against Webster County. Therefore, Mrs. Robinson sincerely believes that this Honorable Court will not "dismiss[] all claims over which it has original jurisdiction." Cf. 28 U.S.C. § 1367 (c)(3).

Finally, Mrs. Robinson respectfully submits that there are no "other compelling reasons for declining jurisdiction" because this is not an "exceptional circumstance." Cf. 28 U.S.C. § 1367 (c)(4). Although Sheriff Mitchell has been convicted of state crimes and Santana Townsend faces state charges, none of these crimes (alleged or admitted) pertain directly to the allegations contained herein. Moreover, while Daren Patterson faces criminal charges for the crimes alleged in the Complaint, default has already been entered against him in this very matter. As such, Patterson has admitted liability. See The City of N.Y. v. Mickalis Pawn Shop LLC, 645 F.3d 114, 128 (2nd Cir., 2011) ("The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff.") Mrs. Robinson asserts that his tacit admission ratifies the Court's jurisdiction over the federal and state claims herein as it would be unfair to ask Mrs. Robinson to refile suit against him in state court when judgment could be rendered against him right here.

## V.    CONCLUSION

Mrs. Robinson has stated valid claims under both state and federal law against Webster County, Mississippi.

Daren Patterson was, for all intents and purposes, a state actor who, while acting pursuant to authority given to him by the chief policymaker for the County, left the Webster County Jail to do exactly as he pleased – up to and including the acts of torture described in the Complaint. The County should be held liable under a <u>Monell</u> theory of liability, as well as the special relationship/state created danger doctrines. Moreover, the County is liable for failing to train and supervise employees and inmates.

To the extent that the County might otherwise assert that Daren Patterson was not in custody, but that he was an illegally released escapee, the County should be estopped from doing so. Moreover, to the extent that the County might assert any defense under the public duty doctrine, the same should be disregarded since the Mrs. Robinson had a special relationship with the County under state law as well.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, FELICIA ROBINSON, rises in opposition to Defendant WEBSTER COUNTY, MISSISSIPPI's Motion for Judgment on the Pleadings, and prays that this Court dismiss the motion with prejudice.

The Plaintiff prays for general relief, whether legal or equitable, that may be meet and proper in the premises.

Respectfully submitted, on this the <u>28th</u> day of August, 2019.

FELICIA ROBINSON

By:    <u>/s/Matthew D. Wilson</u>
Matthew D. Wilson (MS Bar #102344)
The Law Ofc. of Matthew Wilson, PLLC
PO Box 4814, Miss. State, MS 39762-4814
Telephone: 662-312-5039
Email: starkvillelawyer@gmail.com

## CERTIFICATE OF SERVICE

I, Matthew D. Wilson, attorney of record for the Plaintiff, do hereby certify that I have this day caused a true and correct copy of the above and foregoing **MEMORANDUM IN OPPOSITION TO WEBSTER COUNTY, MISSISSIPPI'S MOTION FOR JUDGMENT ON THE PLEADINGS** to be delivered by the ECF Filing System which gave notice to all counsel of record who have appeared herein.

| | |
|---|---|
| William R. Allen, Esq. | Daniel Griffith, Esq. |
| Jessica S. Malone, Esq. | Mary McKay Griffith, Esq. |
| Allen, Allen, Breeland & Allen, PLLC | JACKS \| GRIFFITH \| LUCIANO, P.A. |
| Email: wallen@aabalegal.com | Email: dgriffith@jlpalaw.com |
| **Attorneys for Tim Mitchell, Individually** | **Attorneys for Webster County, Mississippi; Webster County Sheriff's Department; and Tim Mitchell and Santana Townsend, in their official capacities only.** |

I further certify that a true and correct copy of this motion was served on the following person via first-class, U.S. Mail, postage prepaid:

Santana Townsend, pro-se
120 Figgatt Ave.
Eupora, MS 39744

Respectfully submitted, on this the 28th day of August, 2019.

/s/Matthew D. Wilson
Matthew D. Wilson